IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSEPH S. RAMIREZ, <br> PHYLLIS A. RAMIREZ <br>     Plaintiffs, <br> <br>     v. <br> <br> US BANK HOME MORTGAGE, <br>     Defendant. | ) <br> )    1:10-cv-7815 <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    JURY DEMANDED <br> ) |

**COMPLAINT**

1. Plaintiffs Joseph S. Ramirez and Phyllis A. Ramirez bring this action to secure redress for defendant's violation of the Real Estate Settlement Procedures Act, 12 U.S.C. §2605 et seq. ("RESPA"), the Equal Credit Opportunity Act, 15 U.S.C. §1691 et seq. ("ECOA"), the Truth in Lending Act, 15 U.S.C. §1602 et seq., the Illinois Consumer Fraud Act and for common law negligence, gross negligence, breach of contract and promissory estoppel.

2. Plaintiffs seek redress for US Bank's for its willful, reckless and wanton treatment of plaintiffs' home mortgage loan, multiple servicing mistakes, misstatements and/or omissions and for making false and misleading statements with respect to providing plaintiffs with a solution to bring their account current, involving two separate mortgage modifications, and for the deliberate infliction of stress and anxiety by making unreasonable demands for unscheduled payments and sensitive financial information.

**JURISDICTION**

3. This Court has federal question jurisdiction over the RESPA and ECOA claims, and supplemental jurisdiction over the state law claims.

1

4.      Venue is appropriate because the property that is the subject of this lawsuit is located in this District.

**PARTIES**

5.      Plaintiffs Joseph S. Ramirez ("Joe") and Phyllis A. Ramirez ("Phyllis") are husband and wife who reside in the property that is the subject of this lawsuit, in Chicago, Illinois.

6.      US Bank Home Mortgage is US Bank, NA's mortgage servicing division.  It is referred to herein as US Bank or the Bank.

**FACTS**

7.      Plaintiffs purchased their Chicago condominium on July 21, 2005.

8.      In about January 2008, Joe called US Bank.  He told the Bank that he had lost his job, and that plaintiffs anticipated potential problems with paying their mortgage in the future, once they used up their emergency savings fund.  Plaintiffs were current with their mortgage payments at that time.

9.      US Bank told plaintiffs that it could not help with anything until plaintiffs were in default.

10.     Plaintiffs continued making their mortgage payments, which were on time and complete for January, February and March, 2008.

11.     In April 2008, plaintiffs paid as much of the payment as they could; they were about $150 short of their total payment amount.  Defendant accepted the payment, and placed it into a suspense account.

12. Plaintiffs might have been able to make the entire payment at this time by, for example by selling personal property, but did not do so at least partially in reliance upon US Bank's representation that it could offer help if plaintiffs were in default.

13. In around the beginning of May 2008, US Bank sent plaintiffs a delinquency notice.

14. In May 2008, plaintiffs made a partial payment, which was also placed into suspense.

15. Also in around May 2008, US Bank sent plaintiffs a letter, stating that plaintiffs were in jeopardy of foreclosure.

16. Plaintiffs were surprised at the speed at which US Bank sent the breach letter, particularly because they had been in contact with US Bank by telephone with regard to possible non-foreclosure solutions.

17. Indeed, plaintiffs spoke with US Bank on the telephone several times during the summer of 2008, to discuss what plaintiffs were doing everything they could in order to receive the "help" US Bank mentioned in January.

18. In September, 2008, US Bank claimed that plaintiffs owed $703.62 in late fees and $340 in "other charges."

19. US Bank sent plaintiffs a communication dated September 26, 2008 that said that plaintiffs qualified for a mortgage modification. <u>Exhibit A</u>. The modification offered had the following terms: the interest rate was reduced from 6% to 4.5%, and extended the term of the mortgage from 30 years to 40 years. The principal balance of the loan was increased by $20,155.14.

20. According to US Bank, the purpose of the modification was to bring the plaintiffs current. The "congratulations letter" stated that US Bank "want[ed] to work with you to get your loan current." The idea was that after the modification, plaintiffs would owe nothing more than their next monthly payment; that is to say, although the principal balance changed, there would be no fees or penalties due.

21. Plaintiffs accepted the modification and paid a $250 "processing fee" for the modification. The new monthly payments were supposed to be $2,336.91.

22. All amounts were supposed to have been cleared as part of the modification; either waived or rolled into the principal. After all, the purpose of the entire modification was to bring the loan current. This was how plaintiffs understood the modification was supposed to work, and they relied upon the representations in <u>Exhibit A</u> when planning their tight finances for the coming months.

23. Any questions about what Exhibit A included a "Breakdown of fees and charges for Modification," which stated that the first modified payment would be $2,336.91.

24. Plaintiffs' first payment for the modification was due on December 1, 2008.

25. Before, during and after it entered into this mortgage modification, US Bank knew that plaintiffs could not afford to pay more than their monthly payment of $2,336.91.

26. Somehow, despite the promises in the modification papers that the modification would bring the loan current, in December 2008, US Bank claimed that plaintiffs owed an extra $1,043.62.

27. Upon information and belief, US Bank knew that it would be assessing these amounts before, during and after it entered into this mortgage modification. US Bank also

knew that plaintiffs did not expect to have to pay these amounts, and that plaintiffs could not pay this additional money. It entered into the modification, anyway.

28. Although it acknowledged that plaintiffs were entitled to one by including an explanation of such, defendant did not deliver to plaintiffs any Truth in Lending statement, notice of right to cancel or other such required documents, in association with this transaction. Plaintiffs provided plenty of notice of their intent to rescind the transaction through correspondence. If the Court finds that the previous correspondence from plaintiffs was insufficient to trigger rescission, this complaint constitutes notice of plaintiffs' intent to rescind that transaction.

29. Plaintiffs called US Bank in January 2009, to inquire about these extra fees.

30. Also in about January 2009, US Bank contacted plaintiffs to notify them that plaintiffs' escrow was underfunded by approximately $2,680.14.

31. Upon information and belief, US Bank knew that plaintiffs could not afford such a payment, and intentionally or recklessly failed to include these amounts in the new principal amount. Thus, according to US Bank, plaintiffs' monthly payment due on January 1, 2009 was $3,420.53.

32. On December 1, 2008, plaintiffs paid, and US Bank received, plaintiffs' monthly payment of $2,336.91; the precise amount of plaintiff's monthly payment, including escrow, but without any extra fees or extra escrow, under the loan modification.

33. In around January 2009, US Bank started send delinquency letters.

34. On January 16, 2009, in a monthly mortgage statement, US Bank claimed that plaintiffs needed to pay $5,846.18 by February 1, 2009 to become current, and sent plaintiffs a

5

demand letter. On February 16, 2009, US Bank sent plaintiffs a breach letter by certified mail, claiming that plaintiffs owed $4,673.82, plus $882.50 in late fees.

35. Plaintiffs spoke with defendant several times during this time on the telephone trying to figure out how to come to some mutually acceptable solution.

36. Plaintiffs sent US Bank a letter identifying problems with the loan and servicing and disputing the amounts claimed due by US Bank, which US Bank received on March 23, 2009. This letter qualified as a qualified written request under RESPA.

37. US Bank never responded to this letter, and never fixed the problems identified.

38. In around May/June 2009 US Bank told plaintiffs that a new program called "HAMP" was available, and that plaintiffs qualified. US Bank encouraged plaintiffs to apply.

39. US Bank sent plaintiffs paperwork to fill out for the HAMP program, and also took substantial information from plaintiffs on the telephone.

40. US Bank received plaintiffs' application, and on July 16, 2009, sent plaintiffs the communication attached as Exhibit B, which states that plaintiffs had been accepted for the HAMP program.

41. Exhibit B states that there was no escrow shortage as of July 16, 2009, although the mortgage statement dated that same date, Exhibit C, says that plaintiffs were $3,445.84 short for escrow.

42. Plaintiffs signed the HAMP paperwork, and US Bank countersigned. Under the program, plaintiffs were supposed to make three consecutive payments of $1,041.05, including escrow, as a "trial payment" beginning August 1, 2009.

43. Plaintiffs timely paid the three payments of $1,041.05 beginning August 1, 2009. They were never late.

44. On or about October 30, 2009, US Bank sent plaintiffs the communication attached as Exhibit D, which says that plaintiffs were "eligible for a Home Affordable Modification."

45. Plaintiffs executed the HAMP documents, which US Bank timely received. US Bank funded the loan modification on or about November 19, 2009.

46. In doing so, US Bank increased the principal amount of the mortgage by $22,717.99.

47. The new payment pursuant to the HAMP agreement was $1,058.49, due November 1, 2009. Plaintiffs made this payment by November 1, 2009.

48. The December 2009 statement, however, again stated that plaintiffs owed $3,845.95, including an unspecified fee of $1,100, and $1,687.47 for "unpaid late charges," and "overage /shortage" of $26.32, even though they had just entered into a HAMP modification that was supposed to have brought them current.

49. Plaintiff Joe called US Bank on the telephone in November 2009, and was told that US Bank's computers had not "caught up" with the HAMP modifications. Plaintiffs were told to disregard their mortgage statements and pay the $1,058.49. Plaintiffs continued paying this amount until April 2010, when US Bank returned plaintiffs' April 1, 2010 payment, stating that the amount paid was insufficient, per the mortgage agreement.

50. US Bank began vigorous collection activity directed at plaintiffs. Although Joe was out of town, Phyllis was home and received all of these collection attempts. During the

collection calls, US Bank made outrageous claims, such as that plaintiffs were nine months behind on their mortgage payments. At some point, the collections department told plaintiff Phyllis that US Bank had made a mistake, and suggested that plaintiffs send the April 2010 payment again, this time certified funds, which plaintiffs did.

51. The collection activity persisted. On March 3, 2010, without any prior indications, US Bank sent plaintiffs a pre-foreclosure demand letter.

52. On March 18, 2009, US Bank sent plaintiffs <u>Exhibit E</u>, which states in part:

Dear Mortgagor(s):
U. S. Bank Home Mortgage has completed the review of information you provided
to be considered for the U.S. Department of Treasury's Home
to proceed with modifying your mortgage under HAMP because you do not
meet one or more of the basic HAMP financial eligibility requirements
Affordable Modification Program (HAMP). Unfortunately, we are unable
established by the Department of Treasury.
*Excessive Forbearance - We are unable to offer you HAMP because we
are unable to create an affordable payment equal to 31% of your
reported monthly gross income without changing the terms of your loan
beyond the requirements of HAMP.
We understand that this may be difficult news for you, but HAMP
is specific to the types of mortgages, properties, and income and
expense requirements that can be considered for HAMP. There may be other
options available to you that can help stabilize your mortgage and
housing challenges such as, repayment. plans, other non-HAMP
modifications, short safe, or deed in lieu of foreclosure. To further
inquire about eligibility requirements for assistance options please


contact Default Counseling at (800) 355-7900.

A HUD-certified housing counseling organization is an additional
Source of information to assist you. To find a HUD-certified counseling
organization in your area visit the HUD website at www.hud.gov or call-l-
HUD's interactive voice system at (800)569-4287 or (888)995-HOPE.
If you are currently behind on your monthly mortgage payment and/or
active in foreclosure collection and foreclosure activities will continue
on your account unless other arrangements are made with our office.
our decision was based in whole or in part on information obtained from

8

the following consumer credit reporting agencies:....

53. Upon information and belief, Exhibit E is the only adverse action letter US Bank ever sent to plaintiffs.

54. Upon information and belief, US Bank unilaterally "undid" the HAMP mortgage modification in mid-December, 2009, on or about December 17, 2009.

55. US Bank sent Exhibit E, dated March 18, 2010, more than 30 days after it made the decision to undo the HAMP mortgage modification.

56. Exhibit E does not adequately explain anything at all, much less the reasons why it unilaterally rescinded the HAMP transaction.

57. To the extent that Exhibit E mentions that a HAMP payment of $1,041.05 was less than 31% of plaintiffs' gross monthly income, it was wrong. US Bank had actual knowledge at all times in 2009 and 2010 that $1,041.05 was less than 31% of plaintiffs' fixed combined gross monthly income. The letter also mentions "excessive forbearance," which does not adequately or accurately describe the situation, either.

58. In sum, Exhibit E an incorrect, unprofessional, incomprehensible mess.

59. Also on May 18, 2010, US Bank sent plaintiffs Exhibits F and G.

60. Exhibit F demands that plaintiffs send certified funds of $28,503.24 within 30 days, or face foreclosure.

61. Exhibit G purports to respond to a previous communication from plaintiffs, and incorrectly states that plaintiffs were then currently participating, and performing, pursuant to a HAMP trial period.

62. Exhibit G then tells plaintiffs that US Bank was obligated by "State and federal requirements" to send plaintiffs certified letters regarding delinquency.

63. The statements in Exhibit G that US Bank was required to state and federal law to send plaintiffs delinquency notices were incorrect.

64. The collection activity persisted during spring and summer 2010, with US Bank sending over ten separate letters treating foreclosure or legal action or demanding more money or financial information to prevent legal action.

65. Around the end of April, a US Bank representative named Julie Grenier called and told plaintiffs that the case was "going to the attorneys" for foreclosure if plaintiffs did not pay $1,170.25 immediately.

66. Plaintiffs paid the $1,170.25 under protest in order to prevent apparent imminent wrongful foreclosure, and demanded more explanations.

67. In around May 2010, plaintiffs received a communication from US Bank that was a proposed agreement for a term extension that required plaintiffs to pay approximately an extra $1,485.73 per month for three months, in order for plaintiffs to become "caught up." This did not make sense to plaintiffs.

68. Plaintiffs did not accept this proposal.

69. Around early July, 2010, plaintiffs sent US Bank a letter that rejected the May 2010 offer, and asked that the problems with their loan be fixed and asking for information and documents.

70. In around the end of July, US Bank sent plaintiffs a letter that told plaintiffs that US Bank was reviewing plaintiffs' requests, and that US Bank would be responding soon.

71. In this letter, US Bank also admitted to having made errors, and suggested that the parties enter into another modification, regardless of whether plaintiffs qualified for HAMP.

72. Around the beginning of August 2010, plaintiffs spoke with a representative of US Bank, who was supposed to explain the new modification deal. Both plaintiffs were on the phone for this call.

73. The representative stated that US Bank had made errors in computing the forbearance that was mentioned in the March 16, 2010 letter.

74. The representative stated that US Bank had not "realized" that the mistakes had been made, until March, 2010. Upon information and belief, this statement was not true; US Bank knew much earlier about its errors, but concealed such from plaintiffs.

75. Plaintiffs did not accept the new modification, and asked the representative to go back and try to fix the loan. The representative told plaintiffs that the current loan would never be fixed, and that plaintiffs' only choice was to do the new modification.

76. The same representative called in around late September 2010, and asked whether plaintiffs wanted to enter into the new modification. Plaintiffs suggested again that US Bank go back and fix the previous modification to what it was supposed to be. The representative made a "hard sell" on the newly proposed modification, and said that US Bank would not consider any of the issues raised by plaintiff, or any other resolution options.

77. A few days later, plaintiffs sent US Bank a letter describing the telephone conversation, and explained, among other things, why plaintiffs were not interested in the newest modification proposal from US Bank.

78. A few days after this, in the end of September, US Bank sent plaintiffs a barrage of letters, including collection letters, and a letter rescinding one of the previous modification offers that plaintiffs had not accepted. Another letter said that there was a retraction/denial of the newest modification offer. Plaintiffs responded to these in writing.

79. Plaintiffs made their $1,058.49 monthly payments every month until October 2010, except on September 29, 2010, plaintiffs received their payment that was due on October 1, 2010 (paid early) back in the mail from US Bank.

80. Plaintiffs responded with a certified letter asking for information, documents and for defendant to fix the problems with the loan servicing.

81. Around the end of October, US Bank sent plaintiff another pre-foreclosure demand letter. Plaintiff responded in writing, disputing all of the amounts claimed in the letter, and US Bank's calculation of amounts due.

82. Plaintiff also sent US Bank a follow-up letter asking again for specific documents, or an explanation, of what happened to his loan.

83. Plaintiffs have been substantially damaged by defendant's conduct. They constantly worry about whether US Bank will foreclose and put them out on the street. Plaintiffs have suffered extreme emotional distress as a direct result of defendant's actions, omissions and violations.

**COUNT I - RESPA**

84. Plaintiffs incorporate all previous paragraphs.

85. RESPA, 12 U.S.C. §2605(e) requires a mortgage servicer to respond to mortgagee's "Qualified Written Requests" ("QWRs")  See also 24 C.F.R. § 3500.21(e).

12

86. A document is a QWR if it:

   For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—

   (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

   (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

87. Many or all of plaintiffs' written communications with defendant were QWRs.

88. US Bank did not respond adequately, or in many cases at all, to these QWRs.

89. Plaintiff has been damaged as a result of US Bank's violations of RESPA.

WHEREFORE, plaintiffs ask that this Court enter judgment in their favor and against US Bank for:

   a. Statutory and actual damages;

   b. Attorney's fees and costs of suit;

   c. Any other relief the Court deems fit.

### COUNT II - Illinois Consumer Fraud Act

90. Plaintiffs incorporate all previous paragraphs.

91. The actions and omissions of US Bank as described above were unfair pursuant to the Illinois Consumer Fraud Act.

92. Alternatively and additionally, the actions and omissions of US Bank as described above were deceptive.

93. For example plaintiffs relied to their detriment upon US Bank's knowing or recklessly false, incorrect or materially misleading statements in correspondence multiple times. Examples of this include:

   a. Exhibit A: US Bank represented that the first modification would bring plaintiff's loan "current again, and would include $703.62 in late charges and $340.00 in other fees as part of the new principal. Plaintiffs entered into the loan transaction believing this statement, which US Bank knew or should have known was incorrect when made, to plaintiff's detriment.

   b. Exhibit B. Plaintiffs relied upon US Bank's representations in Exhibit B that plaintiffs could "accept" the HAMP modification by completing the steps listed. Plaintiffs completed the steps outlined in Exhibit B, but their modification was later unilaterally revoked by US Bank.

   c. <u>Escrow</u>. It was deceptive for US Bank to send plaintiffs inconsistent statements regarding the status of the escrow account during 2008 through the present. Furthermore, when plaintiffs protested and asked for answers, it was deceptive for US Bank to provide unclear and incorrect answers.

   d. Exhibits D – F. It was deceptive for defendant to send three letters to plaintiff on the same date, each of which stated something different. US Bank knew or should have known that this was happening, and did it anyway, which had the purpose and effect of keeping plaintiffs guessing as to the status of their home and mortgage.

e. It was deceptive for US Bank to have unilaterally rescinded the HAMP mortgage in December 2009. It was further deceptive for US Bank to not have disclosed this fact to plaintiffs until three months later, and in the interim claim that plaintiffs were delinquent, even though plaintiffs had been making payments pursuant to the written HAMP modification agreement.

f. It was deceptive for US Bank not to acknowledge in writing that it had made mistakes in the servicing of plaintiffs' home loan. Instead, although on certain occasions on the telephone US Bank representatives acknowledged mistakes, all written correspondence maintained that US Bank was correct, and by inference, plaintiffs incorrect, about the handling and servicing of plaintiffs' loan.

g. It was deceptive for US Bank to use its servicing and other mistakes (such as the three letters sent on March 18, 2010) to confuse plaintiffs, as leverage to induce plaintiffs into entering into other, less favorable, loans, such as the one proposed by US Bank in May 2010.

h. Placing plaintiffs' payments, made pursuant to a valid written agreement, into a suspense account, rather than posting them to principal and interest, when defendant knew that the payments were proper.

i. Charging late fees when defendant had induced plaintiffs into not paying.

j. Making false statements that US Bank was required to send plaintiffs delinquency and foreclosure notices, even though the parties had entered into a written agreement, with which plaintiffs were complying.

15

94. Plaintiff has been damaged as a result of US Bank's deceptive actions and omissions as alleged above.

WHEREFORE, plaintiffs ask that this Court enter judgment in their favor and against US Bank for:

    a. Actual and punitive damages;

    b. Attorney's fees and costs of suit;

    c. Any other relief the Court deems fit.

### COUNT III – Equal Credit Opportunity Act

95. Plaintiff incorporates all previous paragraphs.

96. The ECOA requires that lenders that perform adverse actions with respect to borrowers or potential borrowers send an "adverse action" letter.

97. Defendant performed adverse actions with respect to plaintiffs, but did not send adequate notice of such.

98. Defendant did not send plaintiffs notice that it had revoked their HAMP loan modification within 30 days of having made the decision to do so.

99. Defendant did not send plaintiffs notice that it had revoked their HAMP loan modification within 30 days actually doing so.

100. When it did send plaintiffs an adverse action letter, Exhibit D, the content of the letter did not comply with ECOA. The letter did not make sense, and stated incorrect facts.

101. Plaintiffs have been damaged as a result of these violations.

WHEREFORE, plaintiffs ask that this Court enter judgment in their favor and against US Bank for:

    a. Actual and punitive damages;

    b. Attorney's fees and costs of suit;

    c. Any other relief the Court deems fit.

### COUNT IV – Negligence

102. Plaintiffs incorporate all previous paragraphs.

103. Defendant owed plaintiffs a duty:

    a. To properly service their loan,

    b. if providing information to plaintiffs, to provide consistent, up-to-date and correct information;

    c. not to make collection efforts if plaintiffs are up-to-date with their payments, or if otherwise improper or imprudent;

    d. not to unilaterally revoke or rescind a mortgage transaction.

104. Defendant breached these duties, and plaintiffs were damaged as a result.

WHEREFORE, plaintiffs ask that this Court enter judgment in their favor and against US Bank for:

    a. Damages;

    b. costs of suit;

    c. Any other relief the Court deems fit.

### COUNT V – Gross Negligence / Willful and Wanton Conduct

105. Plaintiffs incorporate all previous paragraphs.

106. Defendant owed plaintiffs a duty:

    a. To properly service their loan,

    b. if providing information to plaintiffs, to provide consistent, up-to-date and correct information;

    c. not to make collection efforts if plaintiffs are up-to-date with their payments, or if otherwise improper or imprudent;

    d. not to unilaterally revoke or rescind a mortgage transaction.

107. Defendant was willful and wanton in its breach of these duties and others.

108. Plaintiffs were damaged as a result.

WHEREFORE, plaintiffs ask that this Court enter judgment in their favor and against US Bank for:

    a. Damages, including punitive damages;

    b. Attorney's fees and costs of suit;

    c. Any other relief the Court deems fit.

### COUNT VI – Breach of Contract

109. Plaintiffs incorporate all previous paragraphs.

110. There existed, and may still exist, valid contracts between plaintiffs and defendant.

111. Plaintiffs performed under the contract(s).

112. Defendant breached one or more of those contracts.

113. Plaintiff was damaged as a result of defendant's breach(es).

WHEREFORE, plaintiffs ask that this Court enter judgment in their favor and against US Bank for:

    a. Damages, including the benefit of the bargain and specific performance;

    b. costs of suit;

    c. Any other relief the Court deems fit.

### COUNT VII – Promissory Estoppel

114. Plaintiffs incorporate all previous paragraphs. This Count is brought as an alternative to the breach of contract claim.

115. Defendant made unambiguous promises to plaintiffs, upon which plaintiffs reasonably relied to their detriment.

WHEREFORE, plaintiffs ask that this Court enter judgment in their favor and against US Bank for:

    a. Damages, including the benefit of the bargain and specific performance;

    b. costs of suit;

    c. Any other relief the Court deems fit.

### COUNT VIII – Truth in Lending

116. Plaintiffs incorporate all previous paragraphs.

117. Defendant was required to provide truth in lending disclosures to plaintiffs arising out of the two mortgage transactions referenced herein. Although these transactions are called "modifications" herein, with respect to the Truth in Lending Act, in substance, they amount to refinancing of the loan(s).

118. Failure to provide such disclosures is a violation of the Truth in Lending Act.

WHEREFORE, plaintiffs ask that this Court enter judgment in their favor and against US Bank for:

    a. Statutory and actual damages;

    b. Rescission of the loan;

    c. Attorney's fees and costs of suit;

    d. Any other relief the Court deems fit.

Respectfully submitted,

Alexander H. Burke

**BURKE LAW OFFICES, LLC**
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

**JURY DEMAND**

Plaintiff demands trial by jury.

/s/Alexander H. Burke

Alexander H. Burke
**BURKE LAW OFFICES, LLC**
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com

**DOCUMENT PRESERVATION DEMAND**

Plaintiff hereby demands that the defendant take affirmative steps to preserve all recordings, data, documents and all other tangible things that relate to plaintiffs and/or their loan or property. Plaintiffs further demands that defendant obtain agreement from any third party to do the same -- if any third party refuses, you are directed to notify the undersigned immediately so that measures may be taken to avoid spoliation of any relevant or discoverable materials or information. These materials are very likely relevant to the litigation of this claim. This demand shall not narrow the scope of any independent document preservation duties of the defendant.

/s/Alexander H. Burke